IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE<br>NO.  4:10-CR-43-RLV-WEJ |
| MARLOS CELIS-SOSA and LUCIO CELIS SOSA, | |
| Defendants. | |

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on defendant Lucio Celis-Sosa's Motion to Suppress Identification [113] and defendant Marlos Celis-Sosa's Motion to Suppress Identification [117].[1]  The Court conducted an evidentiary hearing on said Motions on January 14, 2011 [128], and March 1, 2011 [140], which have been transcribed [135, 141].[2]  The Government and Lucio have briefed the matter.  (See Def.'s Br. Supp. Mot. Suppress Identification Testimony [142] ("Def.'s Br."); Resp. to Def.'s

---

[1] To avoid confusion, the undersigned refers to the defendants by their first names in this Report and Recommendation.

[2] The Court cites the January 14, 2011 Transcript [135] as "Hr'g Tr. Vol. I" and the March 1, 2011 Transcript [141] as "Hr'g Tr. Vol. II."

Br. Supp. [144] ("Govt.'s Br.").)[3]  On the basis of the testimony and evidence produced at that hearing, the undersigned **REPORTS** that the identification testimony does not violate defendants' due process rights.  Therefore, the undersigned **RECOMMENDS** that defendants' Motions to Suppress Identification [113, 117] be **DENIED**.

I. <u>**STATEMENT OF FACTS**</u>

Special Agent ("SA") Christopher Bower and SA Tim Coakley of the FBI participated in a drug investigation that resulted in the arrest of Lucio and Marlos on September 7, 2010.  (Hr'g Tr. Vol. I at 3-4, 7.)  That investigation relied on a confidential informant ("CI"), who was used extensively and considered reliable because "[e]verything that the CI had told Special Agent Coakley had been determined to be truthful and verified," and because the CI had been involved in prior investigations.  (Id. at 5, 7.)

---

[3] Marlos's post-hearing brief was due on April 6, 2011, fourteen days after the filing of the transcript of the March 1, 2011 hearing.  He did not file a brief.  When contacted by chambers staff on April 19, 2011, counsel did not request an extension of time.  Rather, he stated his intent to file a brief by April 22, 2011, but failed to do so.  Nevertheless, Marlos's Motion parrots the arguments contained in Lucio's Motion and reiterated in his post-hearing brief.  Thus, the record is sufficient for the Court to rule on both Motions.

On September 7, 2010, the CI drove to a Wendy's restaurant in Dalton, Georgia, in a large SUV with an individual passenger (another defendant in this case) who was brokering a purchase of methamphetamine. (Hr'g Tr. Vol. I at 15-16, 37.) The meeting occurred in late afternoon or early evening of a clear, sunny day. (Id. at 17-18; Hr'g Tr. Vol. II at 6, 15-16, 22.) The CI parked next to a Toyota in the Wendy's parking lot. (Hr'g Tr. Vol. I at 16.) The Toyota's occupants were in front of the vehicle with the hood propped up, which the CI explained was "a cover to not look suspicious, why the vehicle would be sitting there for a long time." (Id. at 17, 20, 36.) At that time, the CI had never seen or met either of the two individuals standing outside the Toyota. (Id. at 21, 37.)

The deal broker exited the CI's vehicle and spoke to the two individuals later identified as Lucio and Marlos. (Hr'g Tr. Vol. I at 18.) The CI remained in his vehicle the entire time with his window down. (Id. at 18, 21.) From his vantage point a few feet from the Toyota, the CI observed the men while they conversed with the broker for approximately five minutes and had a clear view of both of them. (Id. at 17, 20, 37.) Marlos approached the CI and asked if he was ready. (Id. at 18, 22.) When the CI nodded his head to indicate "yes," Marlos produced a bag from the back seat of the Toyota and placed it in the back seat of the CI's vehicle. (Id. at 18-

3

19.) The CI then drove away in his vehicle and observed Lucio and Marlos drive away in the Toyota. (Id. at 19, 36.)

After that transaction, law enforcement officers who had surveilled the meeting followed the CI's vehicle and the Toyota. (Hr'g Tr. Vol. I at 19, 22, 27.)[4] Detective Daniel Rann of the Whitfield County Sheriff's Department participated in the surveillance, following the Toyota Camry when it left the Wendy's. (Hr'g Tr. Vol. II at 4, 6-7.) When the Camry stopped at an O'Reilly Auto Parts store, Detective Rann, using binoculars, observed two Hispanic males, one wearing a yellow shirt and the other wearing a white shirt. (Id. at 8, 18.) Detective Rann continued following the Toyota, observing the same individuals stop and enter Walnut Square Mall and then continue to a residence on Ingle Drive, where he and other law enforcement officers set up surveillance. (Id. at 9-10, 12-13.) Lucio and Marlos were arrested at the residence later that evening. (Hr'g Tr. Vol. I at 19; Hr'g Tr. Vol. II at 15.) Photographs of Marlos and Lucio were taken at the house and

---

[4] Additional testimony concerning the investigation and surveillance was elicited during the hearing. (See Hr'g Tr. Vol. I at 25, 27-30, 33-34; Hr'g Tr. Vol. II at 13-14, 16-17, 20-35, 39-46.) This factual summary includes only the testimony that is relevant to the instant Motions.

entered into evidence as Government Exhibits 3 and 4, respectively. (Hr'g Tr. Vol. II at 35, 37.)

On September 10, 2010, SAs Bower and Coakley met with the CI in Dalton. (Hr'g Tr. Vol. I at 8-9, 26.) They met outside on a warm, sunny afternoon, with the CI seated in his vehicle and the agents standing outside it. (Id.) The purpose of the meeting was to have the CI verify the roles of the two individuals in the methamphetamine transaction. (Id. at 8, 31.) Thus, the agents did not consider presenting additional or alternate photographs, or constructing a photo lineup. (Id. at 23-24.) The agents' conversation with the CI occurred in English and there were no troubles with communication. (Id. at 9-10.)

SA Coakley showed two photographs to the CI. (Hr'g Tr. Vol. I at 9.) First he showed the CI the booking sheet from the Whitfield County Sheriff's Office for Marlos, Government Exhibit 1, and asked the CI if he recognized the person in the photograph. (Id. at 10-11.)[5] The CI responded that he recognized the person in the photograph as the driver of the vehicle from the methamphetamine delivery. (Id. at 12.) The CI further noted that the person in the photograph had been wearing a

---

[5] SA Coakley made the handwritten notes on Exhibit 1 after the identification. (Hr'g Tr. Vol. I at 12.)

5

white shirt and blue plaid shorts during the transaction. (Id.) The CI did not name Marlos, and had not seen him or dealt with him before September 7, 2010. (Id. at 13.) The CI's recognition was "immediate" and he seemed "very certain of the identity." (Id.)

SA Coakley then showed the CI the booking sheet from the Whitfield County Sheriff's Office for Lucio, Government Exhibit 2, and asked the CI if he recognized the person in the photograph. (Hr'g Tr. Vol. I at 14.) Without hesitation, the CI identified the person in the photograph as the passenger in the vehicle from the methamphetamine delivery, and noted that he had been wearing a yellow shirt. (Id. at 15.) The CI's recognition of the photograph was "just as certain" as he had been in recognizing Marlos. (Id.)

## II.  **THE CHARGING DOCUMENT**

On December 8, 2010, the grand jury returned a two-count Superceding Indictment [67] against, inter alia, Messrs. Marlos and Lucio Celis-Sosa. Count One alleges as follows:

> Beginning on a date unknown to the Grand Jury, but starting no later than July 1, 2009, and continuing until September 7, 2010, in the Northern District of Georgia, the defendants . . . Marlos Celis-Sosa, Lucio Celis-Sosa . . . did combine, conspire, confederate, agree, and have a tacit understanding with one another and with other persons

known and unknown to the Grand Jury, to violate Title 21, United States Code Section 841(a)(1), that is, to knowingly and intentionally possess with intent to distribute at least 500 grams of a substance and mixture containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A(viii).

Count Two of the Superceding Indictment alleges as follows:

On or about September 7, 2010, in the Northern District of Georgia, the defendants . . . Marlos Celis-Sosa, Lucio Celis-Sosa . . . aided and abetted by each other and by others known and unknown to the Grand Jury, did knowingly and intentionally possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii), and Title 18, United States Code, Section 2.

### III.  CONTENTIONS OF THE PARTIES

Defendants each assert that the CI's photo identifications of them should be suppressed because they were so unreliable as to violate due process. (Def.'s Br. 1-2, 9-14.)  The Government responds that the identifications were reliable and therefore admissible, and that any doubts about the accuracy of the identifications go towards the their weight, not their admissibility. (See Govt.'s Br. 8-11.)

7

## IV. ANALYSIS

The Eleventh Circuit has adopted a two-step analysis to determine the admissibility of out-of-court identifications. Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988); Dobbs v. Kemp, 790 F.2d 1499, 1506 (11th Cir. 1986). First, the Court examines whether the original identification procedure is unduly suggestive. Cikora, 840 F.2d at 895. If the identification procedure is unduly suggestive, the Court "must then consider whether, under the totality of the circumstances, the identification was nonetheless reliable," id., or whether it "created a substantial risk of misidentification at trial." Dobbs, 790 F.2d at 1506. "[R]eliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Here, the Government concedes that the identification procedure was unduly suggestive. (See Govt.'s Br. 8 (suggesting the Court focus only on the second step of the analysis).) The Court agrees that presentation of a single photograph of each defendant is suggestive. See Manson, 432 U.S. at 109 (finding identification procedure suggestive "because only one photograph was used"); Marsden v. Moore, 847 F.2d 1536, 1545-46 (11th Cir. 1988) (citing "unduly suggestive" cases); Dobbs, 790 F.2d at 1506 (procedure impermissibly suggestive where witness shown multiple

8

photographs, all of the defendant). Accordingly, the Court focuses on whether the identification was nonetheless reliable.

In considering whether the totality of the circumstances undermines the reliability of the identification, the Court considers five factors, including (1) the opportunity of the witness to view the suspect, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the level of certainty demonstrated by the witness at the identification, and (5) the length of time between the crime and the identification. Neil v. Biggers, 409 U.S. 188, 199-200 (1972); Cikora, 840 F.2d at 895.

Here, four of the five factors weigh against substantial risk of misidentification.[6] The CI had an opportunity to view the defendants at close range on a clear day for approximately five minutes when he had a high degree of attention because the drug transaction was the reason for the CI's presence. The CI had face-

---

[6] The third factor, the accuracy of the witness's prior description, is not applicable in this case.

to-face contact with Marlos.[7]  Thus, the first two factors are satisfied.[8]  The fourth factor is satisfied because the CI recognized each photo immediately and without hesitation identified which person was the driver and which was the passenger in the Toyota.[9]  See United States v. Moody, 564 F.3d 754, 763 (5th Cir. 2009).  Finally, the fifth factor supports the reliability finding because three days is not such a long time span as to undermine reliability (and Lucio does not argue otherwise).  See

---

[7] Lucio argues that because he "spent the majority of the time away from the CI, never conversed with the CI, and was working on the Toyota," the CI's "attention to [Lucio] was also limited in scope." (Def.'s Br. 13.)  However, the distance between the two was sufficiently short that reliability is not undermined.

[8] The Court rejects Lucio's suggestion that five minutes is "very little opportunity to view the suspect." (Def.'s Br. 13.)  In United States v. Walls, 237 F. App'x 599 (11th Cir. 2007) (per curiam), the Eleventh Circuit noted a bank teller's "extended opportunity to view the robber's face" where the teller "was able to see his face for between thirty seconds and one minute." Id. at 600-01.  Here, five minutes of observation from the driver's seat of an SUV to the front of an adjacent car is more than "very little opportunity."

[9] Lucio contends that because the evidence does not establish when the handwritten notes on Government Exhibit 2 were made, the Court should assume that the notes reading "yellow shirt" and "passenger" were written on the booking sheet before the identification, and therefore visible to the CI on September 10, 2007 (see Def.'s Br. 6-7), notwithstanding that SA Coakley made the notes on Exhibit 1 after the identification. See supra note 5.  However, while that fact would make the identification procedure even more suggestive, it still would not contradict SA Bower's testimony that the CI did not hesitate at all in identifying the photograph of Lucio in Government Exhibit 2 as the passenger from the Toyota. (Hr'g Tr. Vol. I at 15.)

10

Manson, 432 U.S. at 116 ("The photographic identification took place only two days [after the crime]. We do not have here the passage of weeks or months between the crime and the viewing of the photograph.").

In sum, no grounds exist to exclude the out-of-court identification or any in-court identification by the CI. See Manson, 432 U.S. at 116 ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

## V. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendants' Motions to Suppress Identification [113, 117] be **DENIED**.

**SO RECOMMENDED**, this 11th day of May, 2011.

*Walter E. Johnson*
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARLOS CELIS-SOSA and LUCIO CELIS-SOSA,<br><br>Defendants. | CRIMINAL ACTION FILE<br>NO. 4:10-CR-43-RLV-WEJ |

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

AO 72A
(Rev.8/82)

for review by the District Court.  Failure to object to this Non-Final Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 58(b)(2).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 11th day of May, 2011.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE